IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND


MICH AUREL, #317239     *
    Plaintiff,
 v.          *  CIVIL ACTION NO. ELH-17-1201

THE STAFF OF WEXFORD HEALTH  *
 SOURCES
WILLIAM BEEMAN     *
R.N.P. KRISTA BILAK
AHRAF MAHBOOB, MD    *
DR. AKAL MYLGATA
    Defendants.[1]   *
          *****

## MEMORANDUM OPINION

   This prisoner civil rights case was filed by Mich Aurel[2] on May 1, 2017.   ECF 1.[3]   Aurel

also filed a motion for leave to proceed in forma pauperis (ECF 2), which was granted.   ECF 3.

Aurel, an inmate confined at the North Branch Correctional Institution ("NBCI"), has sued several

defendants alleging, *inter alia*, that he has not received medical treatment for his "throat, neck, ear,

thyroid, tongue, low back, hip, head, abdomen [on his left, back, and right side], blood in stool,

crone k [sic] constipation, ulcer to colon, [and] liver disease."   *Id.* at 3.   He complains of "pain to

low back, right hip, head, dizziness, numbness to right hip, all this due to catastrophic fall off top

---

[1] The docket shall be modified to substitute the names of doctors Mahboob Ashraf and
Akal Mulugeta for those of defendants Mahboob and Mylgata.

[2] The Maryland Department of Public Safety and Correctional Services ("DPSCS") lists
plaintiff as Mich Aurel on its "inmate locator" website.  Although plaintiff was prosecuted as
Aurel Mich in the Maryland courts, I will refer to him per the DPSCS designation of Mich Aurel.

[3] All docket references refer to the electronic pagination.

bunk" in March 2016. ECF 1 at 4. Aurel contends that he is slowly dying and has been denied needed medication for eight years. *Id.* at 3. He seeks $10,000,000.00 in damages.

At the time this suit was filed, Aurel had already filed thirty-two actions in this court, three of which were dismissed pursuant to 28 U.S.C. § 1915(e).[4] Therefore, Aurel was barred from proceeding in forma pauperis unless he showed that he was "under imminent danger of serious physical injury." 28 U.S.C. § 1915(g).[5] *See McLean v. United States*, 566 F.3d 391, 404 (4th Cir. 2009).

In a previous civil rights case, Aurel raised similar claims regarding the denial of medical care for "catastrophic injuries" sustained from the March 2016 fall from his bunk. *See Aurel v. Wexford Health Sources, Inc., et al.*, Civil Action ELH-16-1293. And, he raised identical claims regarding his abdominal issues, constipation, positive occult blood samples, and liver disease in several earlier cases. *See Aurel v. Wexford*, Civil Action ELH-13-3721; *Aurel v. Warden , et al.*, Civil Action 15-1127; and *Aurel v. Wexford Health Sources, Inc., et al.*, Civil Action ELH-15-1797. These medical issues were fully briefed throughout 2014 to 2016, and the court examined his claims and granted judgment in favor of the medical defendants.

---

[4] *See Mich v. Nice, et al.*, Civil Action No. JKB-14-1397 (D. Md.); *Aurel v. Gainer, et al.*, ELH-15-1750 (D. Md.); and *Aurel v. Jones, et al.*, ELH-15-1928 (D. Md.).

[5] Specifically, §1915(g) mandates:

In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

The claims raised in this case concern a number of medical issues that have been exhaustively briefed and reviewed by this court over recent years. Therefore, I stated in an Order of May 5, 2017 (ECF 3), that I saw no reason to revisit Aurel's claims regarding his gastrointestinal and liver ailments, or his medical problems arising from his 2016 "catastrophic" fall. *Id.* at 4. Nonetheless, out of an abundance of caution, I ordered Defendant Wexford Health Sources, Inc. ("Wexford") to file a response regarding the medical treatment Aurel has received for his throat, neck, ear, thyroid, and tongue pain under the exception to § 1915(g). *Id.*

Defendants Wexford, William Beeman, R.N.; Krista Bilak, R.N.P.; Mahboob Ashraf, M.D.; and Akal Mulugeta, M.D. responded in July 2017. ECF 13. They filed a motion to dismiss or, in the alternative, for summary judgment, supported by a memorandum (ECF 13-3) (collectively, the "Motion") and exhibits. The exhibits include 190 pages of Aurel's medical records (ECF 13-4) and a signed affidavit from Ava Joubert-Curtis, M.D. ECF 13-5.

Aurel has filed a motion to amend to add allegations regarding the denial of medication, physical therapy and a back brace for right hip pain and numbness. ECF 15. He also mentions that he has liver disease and prostate cancer. *Id.* In addition, he has filed two affidavits (ECF 10 & ECF 21), as well as an opposition to the Motion. ECF 19. Defendants oppose Aurel's motion to amend. ECF 17. They argue, *inter alia*, that Aurel seeks to present claims "that fall outside the scope of the court's order limiting the issues in this case . . . ." *Id.* at 3. They have also filed a reply (ECF 20) to his opposition and have moved to strike (ECF 22) Aurel's second affidavit. *See* ECF 21. In particular, defendants complain that Aurel seeks to insert issues "outside the scope" of the case. ECF 22 at 2.

The case may be resolved without oral argument. *See* Local Rule 105.6. (D. Md. 2016).

To the extent that Aurel seeks to add claims regarding his gastrointestinal and liver ailments, along with the medical problems (back, hip, and head pain) arising from his 2016 "catastrophic" fall, the court shall deny his motion to amend. Only those claims involving Aurel's throat, neck, ear, thyroid, and tongue pain shall be addressed herein. For these same reasons, defendants' motion to strike Aurel's second affidavit, which concerns, in part, his "catastrophic" fall, as well as Aurel's liver, colon and prostate conditions, shall be granted, in part. And, for the reasons that follow, Wexford's motion to dismiss or, in the alternative, for summary judgment, construed as a motion for summary judgment, shall be granted.

## I. Factual Background

Aurel, an adult male in his 50's, is an inmate at NBCI. He is in his 50's. Defendants maintain, through the affidavit of Ava Joubert-Curtis, M.D., Wexford's Medical Director at the Cumberland, Maryland prison complex since May 2017, that Aurel has a medical history for hypothyroidism, asthma, constipation, hypertrophy of prostate, cough, hyperlipidemia, and esophageal reflux. ECF 13-5, Joubert-Curtis Aff.

Defendants present extensive records from Aurel's medical history. *See* ECF 13-4. The records show that on April 4, 2014, Aurel was examined by Registered Nurse ("RN") Kristi Cortez for a sore throat. ECF 13-4 at 1-3. On April 28, 2014, he was seen by Nurse Practitioner ("NP") Janette Clark for complaints of a chronic cough, asthma, and acid reflux ("GERD"). His physical exam was within normal limits. *Id*. at 4-6. On May 13, 2014, Aurel was again seen by Cortez for complaints of a sore throat, coughing, and shortness of breath ("SOB"). He was found on his cell floor and indicated that he collapsed because he was weak from not eating over the past several days. He was assessed as having symptoms of a common cold, cough, and sore

throat. He was prescribed Gualfenesin and Tylenol, directed to increase his fluid intake, and transferred to the main medical unit to obtain a provider assessment. *Id.* at 7-10. On June 13, 2014, Aurel was seen by RN Krista Swan for complaints of SOB, a sore throat, and chronic coughs. The examination revealed no abnormalities. Aurel was provided throat lozenges. ECF 13-4 at 11-12.

Aurel saw Swan again on July 8, 2014, for complaints of throat soreness and other medical issues. Swan noted that Aurel had been repeatedly seen for his complaints. Upon assessment, no abnormalities were observed, with the exception of a slightly red throat, without exudate. Throat lozenges were reordered. ECF 13-4 at 13-14. Aurel was seen by NP Clark on July 18, 2014, raising multiple complaints including asthma and GERD. His respirations were found to be regular. No coughing or wheezing was observed. It was noted that he was receiving inhaled corticosteroids and his esophageal reflux was found to be stable. *Id.* at 15-18. Aurel was seen by Clark again on August 1, 2014, to discuss his lab results. The objective examination of the ears, nose, throat, neck, and respiratory system was unremarkable and he was to be started on medication for hypothyroidism. *Id.* at 19-21.

Aurel was seen by RN Robert Claycomb on September 17, 2014, for multiple complaints, including a sore throat with cough. No redness or swelling of the throat was observed. *Id.* at 22-23. He was examined by NP Clark on September 19, 2014, to discuss test results, and his cough. He claimed that the cough drops were making him nauseous and his throat red. His lungs were found to be clear, he had no SOB or wheezing, and his cough was non-productive. *Id.* at 24-25. On September 26, 2014, Aurel was seen by RN Kimberly Martin for his chief complaints on throat pain, night sweats, and blurry vision. He did not mention any of these ailments during the

examination, but spoke of being a diabetic and having tuberculosis. *Id*. at 26-27.

On October 13, 2014, Aurel was seen in the Chronic Care Clinic ("CCC") by NP Clark for his asthma, which was found to be stable, and GERD, for which he was receiving treatment with PPIs[6] and Tums. The objective findings of the examination revealed no abnormalities. ECF 13-4 at 28-31. On November 22, 2014, Aurel presented himself in the medical department and was seen by RN Monica Wilt for medication renewal and cough. He asked to have his lozenges renewed and complained of frequent coughing and blood in his sputum. His lungs were clear and his respirations were within normal limits ("WNL"). His throat was found to be red and he had a mild cough while in the clinic. Aurel was not able to submit sputum. His prescriptions for lozenges and simethicone[7] were renewed for one month and a chest x-ray was recommended. *Id*. at 32-33.

Aurel was seen in the CCC on December 3, 2014, by Mahboob Ashraf, M.D., complaining of asthma and lower back pain. Ashraf observed that Aurel was on Albuterol and a prescription for Baclofen was ordered for his lower muscular back pain. His examination was otherwise unremarkable. An abdominal x-ray was ordered. *Id*. at 34-36. Aurel was seen on December 26, 2014, by RN Shawna Shumaker for a refill of his throat lozenges. He claimed that he was coughing up blood. His mouth and throat were examined and no redness or blisters were observed. *Id*. at 37-39. On December 30, 2014, he was again seen in the CCC by Dr. Ashraf,

---

[6] PPIs or Proton Pump Inhibitors are used for the prevention and treatment of acid–related conditions such as GERD. *See* https://www.medicinenet.com/proton-pump_inhibitors/article.htm.

[7] Simethicone is used to relieve the painful symptoms of too much gas in the stomach and intestines. *See* https://www.mayoclinic.org/drugs-supplements/simethicone-oral-route/description/drg-20068838.

who observed that Aurel's blood pressure was 140/100 and that he was not on blood pressure medication. A prescription for Lisinopril was ordered. The examination was otherwise normal. *Id.* at 40-41.

On January 7, 2015, Aurel was seen for sick call by NP Clark for his complaints of a chronic bloody cough. His tongue was examined and found to be red. Clark noted that Aurel was prescribed and had been using throat lozenges and guaifenesin syrup. Further, he complained of SOB when he jogged. His physical examination revealed no abnormalities. ECF 13-4 at 42-44. Aurel was examined on January 11, 2015 and January 23, 2015, by RN Shumaker for his complaint that he was still coughing up blood or bloody phlegm. His lungs were found to be clear and Shumaker visually saw no active bleeding, redness, inflammation, or blisters in Aurel's throat. During the entire time in sick-call Aurel did not cough. His vital signs were WNL and the examination was unremarkable. *Id.* at 45-49.

NP Clark saw Aurel on February 4, 2015, for a number of complaints, including a cough and sore throat. *Id.* at 50-52. On February 10, 2015, Aurel was seen by Colin Ottey, M.D., for multiple complaints, such as hemoptysis and coughing, as well as his concerns of an undiagnosed illness. *Id.* at 53-54. Four days later, on February 14, 2015, Aurel was seen by RN Robert Claycomb for complaints of a sore throat, difficulty swallowing, and ear discomfort. His ears were found to be normal, but his throat was inflamed and red. He was assessed as having an ear ache and sore throat and was prescribed lozenges and Aprodine. *Id.* at 55-57.[8]

Aurel reported to sick call on March 2, 2015, indicating that the Aprodine had helped

---

[8] Aprodine is used to relieve symptoms associated with upper respiratory allergies. *See* https://www.drugs.com/otc/720640/aprodine.html.

with his sore throat and difficulty swallowing. NP Clark observed that there were no symptoms indicating a need for lozenges, and the physical examination of Aurel's head, mouth, throat, and respiratory system was unremarkable. *Id*. at 58-59. On March 13, 2015, Aurel was again seen at sick call by NP Clark for multiple complaints, including a sore dry throat and cough. Clark noted that Aurel has chronic sinusitis and post nasal drip. The physical examination was normal and he was deemed to be stable. ECF 13-4 at 60-61. Aurel was seen in the CCC by Dr. Ashraf on March 26, 2015. He denied any complaints of SOB or wheezing. Ashraf noted that Aurel had a sore throat with Tonsillitis/Pharyngitis and started him on Amoxicillin, Otic drops,[9] and Chlorhexidine Gluconate for gargling. *Id*. at 62-66.

Dr. Ottey saw Aurel on April 15, 2015, for his complaints of a sore throat and cough. He reported difficulty with expectorating, but had no fever or chills. His physical examination, including his nose, mouth and throat, revealed no abnormalities. Aurel was referred to a provider in two weeks. *Id*. at 67-68. On April 21, 2015, Aurel was seen by NP Clark for complaints related to a sore throat and cough. Clark observed that Aurel's throat was not red and had no pustules. Aurel was not coughing during the medical visit. The examination was unremarkable. *Id*. at 69-70.

On June 19, 2015, Aurel was again seen by Dr. Ashraf in the CCC to address his ailments, including his sore throat and asthma. Ashraf observed that the symptoms associated with Aurel's sore throat had resolved with an antibiotic treatment, Otic drops, and a gargling solution. *Id*. at 71-73.

---

[9] Otic drops are used to treat pain, congestion, and swelling caused by middle ear inflammation. *See* https://www.webmd.com/drugs/2/drug-15119/analgesic-ear-drops-otic-ear/details.

Aurel was seen by Dr. Ottey in the CCC on September 6, 2015, for a sore throat, hoarseness, and asthma. Ottey found no aspiration, chronic cough, post-nasal drainage, SOB or dysphagia. The physical examination revealed no abnormalities. He was to continue on his asthma treatment (a short-acting beta-agonist and long-term-control corticosteroid inhalers) and it was noted that there had been zero emergency visits for asthma symptoms over the past six months. ECF 13-4 at 74-76. Two days later, on September 8, 2015, Aurel was seen by RN Ricki Moyer for multiple complaints, including those related to ear and throat pain and hoarseness. He was found to be speaking clearly, without hoarseness. He was continued on his current medication. *Id*. at 77-78. On September 30, 2015, NP Clark saw Aurel at sick-call for his request for throat lozenges. Clark saw no indication for "chronic" lozenges, noting that they can worsen reflux. He found Aurel's respiration to be regular, with no cough or audible wheezing. *Id*. at 79-81.

Aurel was examined by RN Claycomb on October 7, 2015, for a chief complaint of a sore throat. Claycomb found no indication for lozenges. *Id*. at 82-83. On November 4, 2015, Aurel was seen by RN Dawn Hawk for multiple complaints related to several sick-call slips he had filed, one of which concerned throat hoarseness. He did not, however, mention an ailment concerning his throat during the visit. Hawk found plaintiff's speech clear with no hoarseness. *Id*. at 84-85.

On January 13, 2016, Aurel was examined by RN Tammy Buser for throat pain. His throat was not discolored and the pain was found to be in the laryngeal area. Mouth rinse was ordered. *Id*. at 86-87. Five days later, Aurel was seen by RN Patricia Rose for a complaint of a sore throat. Examination of his throat was unremarkable. *Id*. at 88-90. On January 21, 2016,

Aurel was assessed by Dr. Ashraf at sick call for multiple complaints, including a sore throat. No cough or audible wheeze was noted. A gargling solution of Chlorhexidine was again ordered by Ashraf. *Id*. at 91-93. Later that month, on January 24, 2016, Aurel was examined by RN Buser for his complaint of a sore throat. His throat was not red and Buser believed that Aurel's acid reflux could be causing the irritation. ECF 13-4 at 94-95.

Aurel was assessed by RN Taylor Hershberger on February 1, 2016, for his multiple complaints, including pain to his throat and neck and "hoarseness caused by a cancerous tumor." Hershberger inspected Aurel's throat and found no redness or exudate present. Lozenges or throat spray were not indicated Aurel was referred to the provider for this "ongoing issue." *Id*. at 96-97. On February 5, 2016, RN Krista Bilak saw Aurel in sick-call for his complaint of a sore throat. It was noted that he had received multiple antibiotic treatments without improvement. A throat culture was obtained. The culture revealed Enterobacter cloacae[10] and the antibiotic Cipro was prescribed. *Id*. at 98-100. On February 17, 2016, RN Moyer examined Aurel for multiple complaints, including throat pain. His throat was found to be unremarkable. *Id*. at 101-102. Dr. Ashraf saw Aurel in the CCC the following day, on February 18, 2016. The examination proved routine. *Id*. at 103-105

On March 29, 2016, RN Moyer assessed Aurel for multiple complaints, including a sore throat and painful right ear. Aurel's throat was slightly red, his right ear canal appeared normal, and there was no swelling of the cervical lymph glands. An email was sent to the provider

---

[10] Enterobacter cloacae is the most common Enterbacter species that can cause diseases in humans. This bacteria is widely distributed in water, sewage and soil, and in the feces of healthy humans. They are opportunistic pathogens and cause infections of wounds and the urinary and respiratory tracts. *See* https://www.livestrong.com › Diseases and Conditions.

regarding Cipro for the throat. *Id*. at 106-107.

RN Amy Booth saw Aurel on April 13, 2016, for multiple complaints. The antibiotic Zithromax was ordered for an inner ear infection. *Id*. at 108-110. RN Moyer examined Aurel two weeks later on April 26, 2016, for multiple requests. Aurel claimed that the Zithromax did not help with his "puss filled throat sores." The physical showed no abnormalities. ECF 13-4 at 111-112.

On May 5, 2016, RN Michael Klepitch assessed Aurel at sick call for multiple complaints. His throat was examined and appeared clear. Aurel was referred to the provider. *Id*. at 113-114. Six days later he was seen by Dr. Ashraf in the CCC. Aurel's medications were reviewed and Ashraf's examination was unremarkable. *Id*. at 115-117.

Aurel was assessed by RN Amy Booth on June 9, 2016, for complaints of throat and ear pain. He believed he had cancer. His throat was "mildly red" but no abnormalities were visible. *Id*. at 118-119. On June 24, 2016, Aurel was examined by Certified Registered Nurse Practitioner ("CRNP") Holly Pierce for his sore scratchy throat, runny nose, and bilateral ear pressure. She assessed Aurel as having allergy-related symptoms and prescribed an allergy medication. *Id*. at 120-122.

On July 2, 2016, Aurel was examined by RN Booth for a sore throat and other complaints. His vital signs were normal and he was prescribed a cream for a toe-nail fungus. *Id*. at 123-124. On July 13, 2016, he was seen by RN William Beeman for complaints, among them a sore throat. Beeman noted that Aurel had no signs or symptoms of a sore throat at that time. *Id*. at 125-127. Less than two weeks later, on July 25, 2016, Aurel was seen by RN Kimberly Martin for a refill of his thyroid medication, Levothyroxine Sodium. *Id*. at 128-129. On July

30, 2016, Aurel was examined by RNP Bilak in the CCC for multiple complaints, including a sore throat and a "bad" thyroid. The examination was unremarkable. Blood studies were ordered. *Id*. at 131-133.

On August 24, 2016, Aurel was seen by RN Booth for multiple complaints, including a right ear infection. His vital signs and ears were all normal. But, he was referred for a possible ear infection. ECF 13-4 at 134-136. Two days later, on August 26, 2016, he was again seen in the medical clinic by RNP Bilak for complaints of right ear pain. Bilak found white debris in his ear canal consistent with a fungal infection. Lubri-skin, Aprodine, and Diflucan[11] were ordered. *Id*. at 137-138.

Aurel was assessed by RN Moyer on September 16, 2016, for multiple complaints, including an infection of his tongue, throat, and allergies. The examination was normal with no redness, edema, or anomaly seen on his tongue. Aurel was prescribed nasal spray and Zyrtec was reordered through the pharmacy. *Id*. at 139-140. Ten days later, Aurel was seen by RNP Bilak for a number of complaints, including a sore throat. Bilak decided to treat Aurel again for Enterobacter cloacae. Cipro was again prescribed. *Id*. at 141-142. The next day, he was seen by RN Cortez, who noted that he was seen at several sick-call appointments, "each regarding a different body site that he feels may 'have cancer.' (Throat, Colon, and Prostate)." *Id.* at 143. Cortez observed that lab work was pending, including a urine culture. The examination revealed no abnormalities. *Id*. at 143-144.

On October 1, 2016, Aurel saw RN Buser to voice his cancer concerns. The physical

---

[11] Diflucan is a prescription drug used to treat fungal infections *See* https://www.drugs.com/diflucan.html

examination was normal and the issue was referred to a CRNP. *Id*., pp. 145-146. On October 23, 2016, RNP Bilak examined Aurel in the CCC. She noted that Aurel was receiving Levothyroxine treatment for his hypothyroidism[12] and asthma. A number of his medications were reordered. ECF 13-4 at 147-149.

On November 16, 2016, Aurel was seen by RNP Bilak for multiple issues, including a sore throat, which Aurel believed was throat cancer. No redness, swelling, or post-nasal drip ("PND") was observed. Bilak recommended a throat culture to ensure that the infection had resolved. On November 28, 2016, RNP Bilak reviewed Aurel's throat culture results, noted that he had candida albicans,[13] and ordered Diflucan for four weeks. ECF 13-4 at 150-152.

Aurel was again seen by RNP Bilak on December 6, 2016, for multiple complaints. The examination was WNL. *Id*. at 153-154. He again saw Bilak ten days later for a periodic physical exam. On examination, Aurel was found stable and he was referred to a male provider due to a "history of issues with females." *Id*. at 155-157. On December 23, 2016, he was examined in sick call by RN Rose for recurring issues. His vital signs were normal and he had no physical abnormalities. A patient care conference was to be scheduled. *Id*. at 158.

On January 13, 2017, Aurel was seen by Dr. Ashraf in the CCC. He was found to be clinically stable, but received lozenges for a sore throat. His other medications were continued.

---

[12] Levothyroxine is used to treat an underactive thyroid (hypothyroidism). It replaces or provides more thyroid hormone, which is normally produced by the thyroid gland. *See* http://www.webmd.com/drugs/2/drug-1433/levothyroxine-oral/details.

[13] Candidiasis is a fungal infection caused by yeasts that belong to the genus *Candida*. Symptoms of candidiasis vary depending on the area of the body that is infected. Candidiasis that develops in the mouth or throat is called "thrush" or oropharyngeal candidiasis. *See* https://www.cdc.gov/fungal/diseases/candidiasis/index.html

*Id*. at 159-163. Four days later, on January 17, 2017, Aurel was seen by RN Beeman, again raising multiple complaints, including a sore throat. He claimed that it was painful when swallowing. Upon examination, his throat was found to be normal. *Id*. at 164-167. On January 31, 2017, Aurel was examined by RNP Bilak for several complaints, including a sore throat. His throat was not reddened and the examination was otherwise unremarkable. ECF 13-4 at 168-169.

Aurel was seen by the patient care team on February 7, 2017. Each of his conditions was discussed and he was provided with the most recent laboratory and diagnostic test results and his current point of care ("POC") was discussed. His conditions were deemed to be under control. Id. at 170-171. On February 10, 2017, a tuberculosis test reactor check was conducted. There was no indication of any problem. *Id*. at 172. RNP Bilak saw Aurel on February 22, 2017, for his multiple sick-call slips. He continued to complain of a sore throat. His throat was slightly reddened and a throat culture was obtained. The physical examination was otherwise WNL. *Id*. at 173-175.

On March 6, 2017, Aurel's medical chart was updated to reflect that his thyroid ("TSH") was elevated. *Id*. at 176. Two days later, he was seen by RNP Bilak for his many complaints, including a sore throat. His throat was not red and no PND was visible. The physical examination was unremarkable. *Id*. at 177-178. Aurel was seen once on March 24 and twice on April 6, 2017, by RNP Bilak, again raising multiple complaints, including a sore throat, hoarseness and bilateral ear pain. His throat was not red, no PND was visible, and his voice was normal. A laboratory study for H. Pylori was ordered. *Id*. at 179-185. On April 26, 2017, Aurel was once more seen by RNP Bilak for numerous complaints, including bilateral ear pain. No

effusion or erthythema was observed and his tympanic membrane ("TM") was normal.  *Id*. at 186-187.

On May 10, 2017, Aurel was seen by CRNP Pierce, again raising a number of complaints, including a sore throat.  The physical examination revealed no abnormalities.  ECF 13-4 at 188-190.

## II.  Standard of Review

The Motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56.  ECF 29.  A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Vol. Fire Dept., Inc. v. Montgomery County*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

Ordinarily, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss."  *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  However, a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d). If the court does so, "the motion must be treated as one for summary judgment under Rule 56," but "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d); *see Adams Housing, LLC v. The City of Salisbury, Maryland*, 672 Fed Appx. 220, 222 (4th Cir. 2016) (per curiam).  But, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious."  *Laughlin v. Metro. Wash. Airports Auth*., 149 F.3d

253, 261 (4th Cir. 1998).

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it." 5 C WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 1366, at 159 (3d ed. 2004, 2011 Supp.). This discretion "should be exercised with great caution and attention to the parties' procedural rights." *Id*. at 149. In general, courts are guided by whether consideration of extraneous material "is likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary. *Id*. at 165, 167.

Summary judgment is ordinarily inappropriate "where the parties have not had an opportunity for reasonable discovery." *E.I. du Pont De Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2012); *see Putney v. Likin*, 656 Fed. App'x 632, 638 (4th Cir. 2016); *McCray v. Maryland Dep't of Transportation*, 741 F.3d 480, 483 (4th Cir. 2015). However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)). To raise adequately the issue that discovery is needed, the non-movant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery. Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

16

"[T]o justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'" *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted). A non-moving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x. 274 (4th Cir.), *cert. denied*, 555 U.S. 885 (2008).

If a non-moving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit does so at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods*, 302 F.3d at 244 (citations omitted). But, the non-moving party's failure to file a Rule 56(d) affidavit does not obligate a court to issue a summary judgment ruling that is obviously premature.

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit. *Id.* (internal citations omitted). Failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court

'served as the functional equivalent of an affidavit.'" *Harrods*, 302 F.3d at 244-45 (internal citations omitted); *see also Putney*, 656 Fed. App'x at 638; *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008). "This is especially true where, as here, the non-moving party is proceeding pro se." *Putney*, 656 Fed. App'x at 638.

Plaintiff has not filed an affidavit in compliance with Rule 56(d). However, there is no indication that any additional materials would create a genuine issue of material fact. As such, I am satisfied that it is appropriate to address the Motion as one for summary judgment, because it will facilitate resolution of this case.

Summary judgment is governed by Fed. R. Civ. P. 56(a), which provides, in part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986). The non-moving party must demonstrate that there are disputes of material fact so as to preclude the award of summary judgment as a matter of law. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986); *see Iraq Middle Mkt. Dev. Found. v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017) ("A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law.").

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion. "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material*

fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.* at 248.

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*; *see Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Raynor v. Pugh*, 817 F.3d 123, 130 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 252. And, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.*

Notably, "[a] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004). As indicated, the court must "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002); *see Roland v. United States Citizenship & Immigration Servs.*, 850 F.3d 625, 628 (4th Cir. 2017); *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

Moreover, the district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477

U.S. at 249; *accord Guessous v. Fairview Prop. Inv., LLC,* 828 F.3d 208, 216 (4th Cir. 2016). Thus, the trial court may not make credibility determinations on summary judgment. *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007); *Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis*, 290 F.3d at 644-45. Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment is generally not appropriate, because it is the function of the factfinder to resolve factual disputes, including matters of witness credibility.

Because plaintiff is self-represented, his submissions are liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). But, the court must also abide by the "'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993), and citing *Celotex Corp.*, 477 U.S. at 323–24).

### III. Discussion

#### A. Supervisory, Respondeat Superior, and Personal Liability

Aurel names Wexford Health Sources, Inc. ("Wexford") as a defendant. As argued by defendant Wexford (*see* ECF 13-3 at 12 & 13), such Eighth Amendment claims may not be raised against it as a corporate entity as it cannot be held liable under 42 U.S.C. § 1983.

Principles of municipal liability under § 1983 apply equally to a private corporation. Therefore, a private corporation is not liable under § 1983 for actions allegedly committed by its employees when such liability is predicated solely upon a theory of respondent superior. *See*

*Austin v. Paramount Parks, Inc.,* 195 F.3d 715, 727-28 (4th Cir. 1999); *Powell v. Shopco Laurel Co.*, 678 F.2d 504, 506 (4th Cir. 1982); *Clark v. Maryland Dep't of Public Safety and Correctional Services,* 316 Fed. Appx. 279, 282 (4th Cir. 2009). The allegations against Wexford do not support a claim based on supervisory liability. *See*, *e.g.*, *Thompson v. Virginia*, 878 F.3d 89 at 110-11 (4th Cir. 2017). Plaintiff fails to allege any specific facts against Wexford that support a supervisory liability claim in a § 1983 action.

In such a case, a plaintiff must allege:

> (1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to how deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir.), *cert. denied*, 513 U.S. 813 (1994) (citations omitted).

In view of the foregoing, the claim against Wexford is subject to dismissal.

The court now turns to the merits of Aurel's Eighth Amendment claim against the medical defendants.

### B. Eighth Amendment Liability Against Medical Defendants

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Estelle v. Gamble*, 429 U.S. 97, 102 (1976); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). In order to state an Eighth Amendment claim for denial of adequate medical care, a plaintiff must demonstrate that the actions of the defendant or the failure to act amounted to deliberate indifference to a serious

medical need. *See Estelle*, 429 U.S. at 106; *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014); *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). The Fourth Circuit has characterized the applicable standard as an "exacting" one. *Lightsey*, 775 F.3d at 178.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *King*, 825 F.3d at 219. A "'serious . . . medical need'" is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Iko*, 535 F.3d at 241 (quoting *Henderson v. Sheahan,* 196 F.3d 839, 846 (7th Cir. 1999)); *see Scinto*, 841 F.3d at 228. And, in a case involving a claim of deliberate indifference to a serious medical need, the inmate must show a "significant injury." *Danser v. Stansberry*, 772 F.3d 340, 346 n.8 (4th Cir. 2014).

Proof of an objectively serious medical condition does not end the inquiry. The subjective component requires a determination as to whether the defendant acted with reckless disregard in the face of a serious medical condition, *i.e.*, with "a sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *see Farmer*, 511 U.S. at 839-40; *Scinto*, 841 F.3d at 225. Put another way, "[t]o show an Eighth Amendment violation, it is not enough that an official *should* have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Lightsey*, 775 F.3d at 178.

The Fourth Circuit has said: "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997); *see also Young v. City of Mt. Ranier*, 238 F.3d 567, 575-76 (4th Cir. 2001). As the *Farmer* Court explained, 511 U.S. at 837, reckless disregard occurs when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference." Thus, "[a]ctual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Center*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844).

Notably, deliberate indifference "is a higher standard for culpability than mere negligence or even civil recklessness" and, "as a consequence, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference." *Lightsey*, 775 F.3d at 178; *see also Scinto*, 841 F.3d at 225; *Russell v. Sheffer*, 528 F.2d 318, 319 (4th Cir. 1975); *Donlan v. Smith*, 662 F. Supp. 352, 361 (D. Md. 1986). What the Court said in *Grayson v. Peed*, 195 F.3d 692, 695- 96 (4th Cir. 1999), resonates here: "Deliberate indifference is a very high standard – a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . To lower this threshold would thrust federal courts into the daily practices of local police departments."

Although the deliberate indifference standard "'entails more than mere negligence . . . it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *King*, 825 F.3d at 219 (quoting *Farmer*, 511 U.S. at 835). A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "'that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015) (quoting *Farmer*, 511 U.S. at 842).

Notably, if a risk is obvious, a prison official "cannot hide behind an excuse that he was unaware of a risk, no matter how obvious." *Brice*, 58 F.3d at 105. In *Scinto*, 841 F.3d at 226, the Fourth Circuit said:

> A plaintiff also makes out a prima facie case of deliberate indifference when he demonstrates "that a substantial risk of [serious harm] was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official . . . had been exposed to information concerning the risk and thus must have known about it . . . ." *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (first alteration in original) (internal quotation marks omitted) (quoting *Farmer*, 511 U.S. at 842). Similarly, a prison official"s "[f]ailure to respond to an inmate's known medical needs raises an inference [of] deliberate indifference to those needs." *Miltier v. Beorn*, 896 F.2d 848, 853 (4th Cir. 1990), *overruled in part on other grounds by Farmer*, 511 U.S. at 837.

However, even if the requisite subjective knowledge is established, an official may still avoid liability if he "responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844; *see Scinto*, 841 F.3d at 226. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F. 3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir.

1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken)).

Moreover, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely *desirable.*" *Bowring v. Godwin,* 551 F.2d 44, 47-48 (4th Cir. 1977) (emphasis added). Thus, inmates do not have a constitutional right to the treatment of their choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2nd Cir. 1986). And, disagreements between an inmate and medical staff as to the need for or the appropriate extent of medical treatment do not give rise to a constitutional injury. *See Estelle*, 429 U.S. at 105-06; *Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3rd Cir. 1970)); *see also Fleming v. LeFevere*, 423 F.Supp.2d 1064, 1070-71 (C.D. Cal. 2006).

"[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference". *Johnson v. Quinones* 145 F. 3d 164, 166 (4th Cir. 1998). Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present. *Id*. at 169 (Actions inconsistent with an effort to hide a serious medical condition, refutes presence of doctor's subjective knowledge).

Here, Aurel's medical records, as well as the Affidavit of Dr. Ava Joubert-Curtis, speak for themselves. There is no dispute that Aurel has been seen countless times by nurses and physicians for his assorted medical complaints. Indeed, in some instances he was examined several times within a month. The examinations were, for the most part, unremarkable. When a condition revealed itself through examination or diagnostic laboratory tests, it was treated with

prescription medication, such as antibiotics or over-the-counter medication.

Indeed, Aurel was prescribed a litany of medications for his conditions.  He also received frequent laboratory tests, and is routinely seen in the CCC.  Aurel may believe he is not receiving the correct medical care for his subjective belief that he has cancer in his throat and thyroid, as well as other organs.  But, based upon the frequency of the objective examinations, the laboratory test results, and conclusions made by healthcare professionals, he has never been medically diagnosed with those conditions and had otherwise been found to be stable.

What the Seventh Circuit said in *Cooper v. Casey*, 97 F.3d 914, 916-17 (7th Cir. 1996), is apt:

> A prison's medical staff that refuses to dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue—the sorts of ailments for which many people who are not in prison do not seek medical attention—does not by its refusal violate the Constitution.  The Constitution is not a charter of protection for hypochondriacs.  But, the fact that a condition does not produce "objective" symptoms does not entitle the medical staff to ignore it.

Aurel's complaints regarding his throat, ears, and thyroid were not ignored.  He has been provided constitutionally adequate care in the form of examinations, diagnostic testing, and prescription medications.   His disagreement with the care he has received does not demonstrate a constitutional violation under the Eighth Amendment.

## IV.     Conclusion

For the aforementioned reasons, defendants' Motion shall be granted.  A separate Order follows.


Date:  January 26, 2018                      _____/s/_____
                                             Ellen L. Hollander
                                             United States District Judge

26